UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RONALD JACKSON,

       Petitioner,                                  Hon. Janet T. Neff

v.                                                Case No. 1:08-CV-634

CINDI CURTIN,

       Respondent.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Jackson's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Jackson's petition be **denied**.

## BACKGROUND

As a result of events that occurred on or about November 4, 2004, Petitioner was charged with: (1) possession with the intent to deliver less than 50 grams of cocaine; (2) possession with the intent to deliver 50 to 449 grams of cocaine; and (3) maintaining a drug house.

A preliminary examination was first conducted concerning the charges of possession with the intent to deliver 50 to 449 grams of cocaine and maintaining a drug house. Several individuals testified at this examination, the relevant portions of which are summarized below.

1

**Robert Wiersma**

As of November 4, 2004, Wiersma was employed as a City of Grand Rapids Police Officer. (Hearing Transcript, January 5, 2005, 5). On that date, Wiersma participated in the execution of a search warrant at an apartment located at 1465 Burke Avenue, Northeast, Grand Rapids. (Tr. 5-6). Wiersma discovered in the apartment mail addressed to Petitioner. (Tr. 6). When Petitioner was arrested later that evening, a search of his vehicle revealed "a scale with suspected cocaine residue." (Tr. 6-7).

As a result of further investigation, Wiersma (and other officers) contacted Robert Hendrickson. (Tr. 7-8). The other officers spoke with Hendrickson, after which Wiersma and the other officers traveled to the York Creek apartment complex. (Tr. 8-10). Pursuant to consent given by Hendrickson, the officers then searched an apartment, gaining access thereto using a key recovered from Petitioner. (Tr. 10-11). A search of the apartment revealed a duffle bag in which was located a large quantity of cocaine, as well as "pill bottles" in Petitioner's name. (Tr. 12-13).

**Robert Hendrickson**

As of November 4, 2004, Hendrickson was residing in Greenville. (Hearing Transcript, January 5, 2005, 24). That evening, several police officers visited Hendrickson. (Tr. 24-25). The officers informed Hendrickson that Petitioner had been arrested on drug charges. (Tr. 25). The officers asked Hendrickson if he maintained a residence in the York Creek apartment complex. (Tr. 27). Hendrickson indicated that he had recently leased an apartment there and that he and Petitioner were going to be roommates. (Tr. 27-35). Hendrickson reported that his was the only name on the lease. (Tr. 28, 32). The officers asked Hendrickson if they could search the apartment,

2

to which Hendrickson consented. (Tr. 28-29). Hendrickson testified that his consent was not obtained through threat or coercion. (Tr. 29).

**John Bylsma**

Bylsma assisted in the subsequent search of Hendrickson's apartment. (Hearing Transcript, January 5, 2005, 41). Bylsma discovered "numerous" plastic baggies with "the corners snipped off," indicating that they had been used to package drugs. (Tr. 41-42). Bylsma indicated that the amount of cocaine recovered from the apartment, more than 300 grams, indicated that the cocaine was intended for distribution as opposed to personal use. (Tr. 42-43).

Another preliminary examination was subsequently conducted concerning the charge of possession with the intent to deliver less than 50 grams of cocaine. Several individuals testified at this proceeding, the relevant portions of which are summarized below.

**Holly Botts**

As of November 4, 2004, Botts was employed as a City of Grand Rapids Police Officer. (Hearing Transcript, January 20, 2005, 4). On that date, Botts participated in the execution of a search warrant at an apartment located at 1465 Burke. (Tr. 4). In the kitchen, Botts discovered mail addressed to Petitioner at that address. (Tr. 4). Botts also discovered sandwich baggies and a bag of marijuana. (Tr. 4-5).

**John Bylsma**

As of November 4, 2004, Bylsma was employed as a City of Grand Rapids Police Officer. (Hearing Transcript, January 20, 2005, 6). On that date, Bylsma assisted in the search of the Burke residence. (Tr. 6-7). Bylsma discovered a small amount of cocaine, as well as what appeared to be "drug records." (Tr. 7-9).

**Keith Hefner**

As of November 4, 2004, Hefner was employed as a City of Grand Rapids Police Officer. (Hearing Transcript, January 20, 2005, 14). On that date, Hefner assisted in the search of the Burke residence. (Tr. 14). Hefner discovered a small amount of cocaine. (Tr. 14).

**Robert Wiersma**

As of November 4, 2004, Wiersma was employed as a City of Grand Rapids Police Officer. (Hearing Transcript, January 20, 2005, 16). On that date, Wiersma assisted in the search of the Burke residence. (Tr. 16). After entering the apartment, Wiersma spoke with Theresa Paniwozik. (Tr. 17). Wiersma asked Paniwozik to contact Petitioner and ask him to return to the apartment, which she did. (Tr. 17-19). A short time later, Petitioner returned to the residence where he was arrested. (Tr. 20-21). A search of Petitioner revealed, in part, a key to another apartment which officers subsequently searched. (Tr. 21-22, 27-30).

Petitioner was bound over for trial on all three charges, which were subsequently joined for resolution in a single trial. Several individuals testified at Petitioner's jury trial. The

relevant portions of their testimony are summarized below.

**Holly Botts**

As of November 4, 2004, Botts was employed as a City of Grand Rapids Police Officer. (Trial Transcript, June 7, 2005, 67-68). On that date, Botts participated in the execution of a search warrant at an apartment located at 1465 Burke Avenue, Northeast, Grand Rapids. (Tr. 68). In the kitchen of the apartment, Botts discovered mail addressed to Ronald Jackson and R. Jackson at the address being searched. (Tr. 68-69). Botts also discovered marijuana and a box of sandwich baggies. (Tr. 69-70).

**Keith Hefner**

As of November 4, 2004, Botts was employed as a City of Grand Rapids Police Officer. (Trial Transcript, June 7, 2005, 73). On that date, Hefner participated in the execution of a search warrant at an apartment located at 1465 Burke Avenue, Northeast, Grand Rapids. (Tr. 73). In one of the bedrooms of the apartment, Hefner discovered a "chunk of crack cocaine" weighing approximately 25 grams. (Tr. 73-75).

**Todd Butler**

As of November 4, 2004, Butler was employed as a City of Grand Rapids Police Officer. (Trial Transcript, June 7, 2005, 78). On that date, Butler participated in the execution of a search warrant at an apartment located at 1465 Burke Avenue, Northeast, Grand Rapids. (Tr. 78). During the search, Butler discovered crack cocaine and two glass crack pipes. (Tr. 79-81). After

5

the search was complete, Butler assisted in a surveillance operation that resulted in Petitioner's arrest. (Tr. 81-82).

**Theresa Paniwozik**

Paniwozik worked for Petitioner as a drug courier. (Trial Transcript, June 7, 2005, 84-87). Paniwozik also accompanied Petitioner on interstate trips to purchase cocaine. (Tr. 89-92). Paniwozik was present when police conducted the aforementioned search and agreed to cooperate with the police. (Tr. 88-89, 95-96). Following the search Paniwozik telephoned Petitioner and asked him "to come back to the apartment." (Tr. 96-98). Petitioner did so and was arrested upon his return. (Tr. 105). Paniwozik also informed the police that Petitioner "had an apartment at York Creek." (Tr. 105-06). Paniwozik told the police that the York Creek apartment was leased by a man named "Smiley." (Tr. 106).

**Robert Wiersma**

As of November 4, 2004, Wiersma was employed as a City of Grand Rapids Police Officer. (Trial Transcript, June 7, 2005, 119-20). On that date, Wiersma participated in the execution of a search warrant at an apartment located at 1465 Burke Avenue, Northeast, Grand Rapids. (Tr. 120-21). Upon entering the apartment, Wiersma encountered Theresa Paniwozik, who indicated that the drugs in the apartment did not belong to her. (Tr. 121).

Wiersma informed Paniwozik of her Miranda rights, after which she agreed to assist the police locate Petitoner. (Tr. 121-22). Paniwozik telephoned Petitioner and asked him to return to the apartment. (Tr. 122). Petitioner was arrested upon his return to the apartment. (Tr. 122-25).

A search of Petitioner's vehicle uncovered "assorted house keys," one of which opened the Burke Avenue apartment. (Tr. 124-26). Officers subsequently learned that another one of the keys opened Apartment 10 located at 4247 Alpenhorn Drive, Northwest. (Tr. 126-27). Officers also recovered from Petitioner's vehicle a pocket-sized digital scale which Wiersma indicated was commonly used by drug dealers. (Tr. 129-30).

Wiersma, accompanied by other police officers, traveled to the York Creek apartment complex where they were informed by management that Apartment 10, 4247 Alpenhorn Drive, Northwest, was leased in the name of Robert Hendrickson (a.k.a. Smiley) alone. (Tr. 133-36). Hendrickson gave the officers consent to search the apartment. (Tr. 134-35). Entry to the apartment was obtained by using the key recovered from Petitioner's vehicle. (Tr. 136-37). In one of the bedrooms, Wiersma discovered a duffle bag. (Tr. 137-38). A search of the duffle bag revealed a digital scale and more than 300 grams of cocaine. (Tr. 137-39). The duffle bag also contained two prescription bottles in Petitioner's name. (Tr. 140). Two additional prescription bottles, also in Petitioner's name, were "on the floor" near the duffle bag. (Tr. 140).

**John Bylsma**

As of November 4, 2004, Bylsma was employed as a City of Grand Rapids Police Officer. (Trial Transcript, June 8, 2005, 20-21). On that date, Bylsma participated in the search of the Alpenhorn Drive apartment. (Tr. 21). The amount of cocaine recovered from the apartment would yield approximately three thousand rocks of crack cocaine, each of which sells for approximately twenty dollars. (Tr. 21-23). There was no evidence that cocaine was being used in the apartment. (Tr. 26). Officers also discovered a large quantity of plastic sandwich baggies with

7

the corners cut off, indicating that they had been used to package drugs. (Tr. 21-26). Bylsma concluded, therefore, that the Alpenhorn apartment was being used specifically for the packaging and delivery of cocaine. (Tr. 26-27).

**Robert Hendrickson**

On November 5, 2004, several police officers arrived at Hendrickson's Greenville residence. (Trial Transcript, June 8, 2005, 38-39). The officers informed Hendrickson that Petitioner had been arrested. (Tr. 39). They also asked Hendrickson if he maintained an apartment in the York Creek apartment complex. (Tr. 39-40). Hendrickson indicated that he had leased a two-bedroom apartment there the previous month and was planning on moving in as soon as he obtained a vehicle. (Tr. 39-42). The lease was executed in Hendrickson's name only, but he and Petitioner planned to live there as roommates. (Tr. 41-42). Petitioner paid the security deposit and the first month's rent. (Tr. 42). When Hendrickson signed the lease he was provided a single key, which he gave to Petitioner. (Tr. 43). When the officers asked to search the apartment, Hendrickson consented thereto. (Tr. 43).

Following the presentation of evidence, the jury found Petitioner guilty of: (1) possession with the intent to deliver less than 50 grams of cocaine; (2) possession with the intent to deliver 50 to 449 grams of cocaine; and (3) maintaining a drug house. (Tr. 116-17). Petitioner was also found to be a third-felony offender. (Sentence Transcript, August 5, 2005, 6). Petitioner was sentenced to 3-40 years and 11-40 years on the two possession charges and 2-8 years for maintaining a drug house. (Tr. 6-7). Petitioner's subsequent motion for new trial was denied by the trial court. Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claim:

> I. Did the trial court err by denying Defendant's motion for a new trial based on his claim that his attorney was ineffective due to his failure to present any relevant authority in his motion to suppress evidence obtained in the warrantless search of the Alpenhorn apartment.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Jackson,* 2007 WL 778163 (Mich. Ct. App., Mar. 15, 2007). Asserting the same claim, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Jackson,* No. 133699, Order (Mich., July 30, 2007). On June 5, 2008, Petitioner initiated the present action in which he asserts the claim identified above.

**STANDARD OF REVIEW**

Jackson's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule

10

from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let

alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

**ANALYSIS**

After a jury was selected, but before opening statements or the presentation of evidence, Petitioner moved to suppress the evidence recovered from the Burke Avenue apartment and the Alpenhorn Drive apartment. (Trial Transcript, June 7, 2005, 8). Rather than present additional evidence or testimony, Petitioner agreed to rely on the testimony presented at the preliminary hearings as the "sole basis for determining the facts" of his motion to suppress. (Tr. 25). Petitioner's motion to suppress was denied. (Tr. 25-30).

Following his conviction, Petitioner, represented by new counsel, moved for a new trial. (Hearing Transcript, January 27, 2006, 3). Petitioner asserted that his trial counsel's effort to obtain suppression of the evidence in question was ineffective. (Tr. 4). Petitioner then articulated an argument that he believed would have prevailed if advanced by trial counsel. (Tr. 4-9). The court subsequently denied Petitioner's motion for new trial.[1] Petitioner now asserts that he is entitled to relief because his trial counsel rendered ineffective assistance when he unsuccessfully attempted to obtain suppression of the evidence seized from the Alpenhorn Avenue apartment.

---

[1] The record does not appear to contain a copy of the trial court's decision. In his amended petition, however, Petitioner asserts that in denying his motion for new trial, the trial court concluded that even if trial counsel's performance was deficient, Petitioner suffered no prejudice as the evidence in question was admissible.

12

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

The Fourth Amendment to the United States Constitution provides, in relevant part, that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. A search occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). A warrantless search of a private residence is presumptively unreasonable and, therefore, unlawful, unless justified by an exception to the warrant requirement. *See United States v. Brown*, 449 F.3d 741, 744 (6th Cir. 2006).

One of the exceptions to the general requirement that a residence can be searched only pursuant to a valid search warrant, is that a search conducted "with the voluntary consent of an individual possessing authority" satisfies the Fourth Amendment. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citation omitted). Such individual "might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent." *Id.* (citations omitted).

For purposes of Fourth Amendment analysis, common authority does not depend on "property rights," but derives from the "*mutual use* of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Waller*, 426 F.3d 838, 845 (6th Cir. 2005) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

When determining whether "common authority" exists, courts consider various factors none of which appear to be dispositive. *See, e.g., Pratt v. United States*, 214 Fed. Appx. 532, 535 (6th Cir., Jan. 22, 2007) (considering such factors as whether the individual: (1) owned the residence or was named on the lease; (2) contributed rent; (3) visited when the co-occupant was not present; and (4) possessed a key); *United States v. Murphy*, 516 F.3d 1117, 1123 (9th Cir. 2008) (considering such factors as whether the individual: (1) possessed a key; (2) stored personal belongings in the residence; and (3) possessed the ability to entertain guests); *United States v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006) (considering such factors as whether the individual: (1) possessed a key to the premises; (2) admitted to living at the residence; (3) possessed a driver's

14

license listing the residence as his legal address; (4) received mail at the residence; (5) kept clothing at the residence; (6) had a child that resided at the residence; (7) kept personal belongings at the residence; (8) performed household chores at the residence; (9) was listed on the lease and/or pays rent; and (10) was allowed in the premises when the owner is not present).

Moreover, even where an individual "in fact lacks common authority over the premises, a search conducted pursuant to his or her consent will not violate the Fourth Amendment guarantees if the police reasonably believed that the [individual] had such authority." *United States v. Penney*, 576 F.3d 297, 307 (6th Cir. 2009) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)). When assessing whether the police reasonably believed that an individual possessed common authority over a residence, the standard is whether "the facts available to the officer at the moment [would] warrant a man of reasonable caution [to believe] that the consenting party had authority over the property." *United States v. Purcell*, 526 F.3d 953, 963 (6th Cir. 2008) (quoting *Rodriguez*, 497 U.S. at 188).

The evidence presented at the preliminary hearings, which was completely consistent with that subsequently presented at trial, demonstrated that Robert Hendrickson was the only individual identified on the lease of the apartment in question. Hendrickson also testified that he leased the apartment with the intention of residing there with Petitioner. Such evidence is sufficient to support a finding that Hendrickson possessed "common authority" over the premises and, furthermore, that the police reasonably believed that Hendrickson possessed such authority. Hendrickson also testified that he was not threatened or coerced into giving consent to search his apartment. Thus, the evidence supported a finding that the police searched the residence in question pursuant to "the voluntary consent of an individual possessing authority." With respect to whether

15

Hendrickson possessed authority to consent to the search of the Alpenhorn residence, the Michigan Court of Appeals concluded as follows:

> Defendant additionally argues that Hendrickson lacked authority to consent to the search of the Alpenhorn apartment. Valid consent is a recognized exception to the warrant requirement. The validity of the consent depends on the totality of the circumstances and the plaintiff bears the burden of proving that the person consenting did so freely and voluntarily. A third party may consent to the search when he or she does so voluntarily and possesses common authority over the premises.
>
> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent. . .rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
>
> In this case, Hendrickson possessed more than a mere property interest in the premises. As the trial court indicated, this situation involved two intended roommates: "one whose name was on the lease, and one who paid the rent." Hendrickson, whose name was on the lease, intended to move into the apartment within one week and could have obtained a key from the apartment manager without difficulty. Based on this evidence, we find that Hendrickson and defendant shared joint access to and control over the apartment. Defendant assumed the risk that Hendrickson might permit it to be searched and Hendrickson had authority to authorize the search.

*Jackson*, 2007 WL 778163 at *3 (internal citations omitted).

Petitioner also argues that even if Hendrickson possessed sufficient authority to consent to a general search of the apartment, he lacked authority to consent to a search of the bedroom in which the duffle bag was located, as well as the duffle bag itself.

As is well recognized, the "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Accordingly, the standard for measuring the scope

of an individual's consent is that of "objective reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the [individual]." *Id.* at 251. The scope of a search is "generally defined by its expressed object." *Id.* Consent to search a particular area "normally includes the containers within that area." *United States v. Caldwell*, 518 F.3d 426, 430-31 (6th Cir. 2008) (citing *Jimeno*, 500 U.S. at 251). Moreover, "[a] reasonable person may be expected to know that narcotics are generally carried in some form of container." *Jimeno*, 500 U.S. at 251. As the *Jimeno* Court further observed, "[a] suspect may of course delimit as he chooses the scope of the search to which he consents[, b]ut if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Id.* at 252.

The police informed Hendrickson that Petitioner had been arrested on drug charges. A reasonable person would, therefore, have understood that the police were seeking to search Hendrickson's apartment for drugs or evidence of drug activity. There is no evidence that Hendrickson limited in any way the scope of his consent. There is likewise no evidence that the area where the duffle bag was located was in an area over which Petitioner had exclusive use. The evidence, therefore, supported a finding that the scope of Hendrickson's consent extended to the duffle bag. On this question, the Michigan Court of Appeals concluded:

> Defendant additionally argues that Hendrickson lacked common authority over the bedroom and duffle bag, and he could not consent to a search of those. In making his argument, defendant claims that the detectives should have assumed that the bedroom and bag belonged to defendant. We disagree. The detectives received information that the apartment was empty, not that defendant lived there or had property there. Further, it appeared that none of the rooms were reserved for defendant's private or exclusive use. Therefore, Hendrickson had common authority over all of the rooms in the apartment at the time he consented to the search, and it was

17

> reasonable for the detectives to believe that he also possessed authority over all of the containers on the premises.

*Jackson*, 2007 WL 778163 at *3 (internal citations omitted).

Having found that the search of Hendrickson's apartment did not violate Petitioner's Fourth Amendment rights, the Michigan Court of Appeals rejected Petitioner's claim that his trial counsel rendered ineffective assistance by failing to secure the suppression of the evidence discovered in Hendrickson's apartment. As the Michigan Court of Appeals concluded:

> Because the evidence seized from the Alpenhorn apartment was admissible at trial, we cannot conclude that defense counsel's performance was ineffective. Although the challenged evidence was fatal to defendant's case, he cannot establish that defense counsel's performance was outcome determinative. As the trial court indicated, even if defense counsel had presented a timely and elaborate argument on this issue, the challenged evidence would still have been admissible at trial. Therefore, because defendant failed to overcome the presumption of effective assistance of counsel, we find that the trial court did not abuse its discretion in denying his motion for new trial.

*Jackson*, 2007 WL 778163 at *3 (internal citations omitted).

The rejection of Petitioner's claim by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Jackson's petition for writ of habeas corpus be **denied**. The

18

undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: October 6, 2010
 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge